# 24-1704

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

Mid Vermont Christian School, on behalf of itself and its students and its students' parents,
A. G., by and through their parents and natural guardians, Chris and Bethany Goodwin,
M. G., by and through their parents and natural guardians, Chris and Bethany Goodwin,
Christopher Goodwin, individually, Bethany Goodwin, individually,
Plaintiffs - Appellants,

T. S., by and through their parents and natural guardians, Nathaniel and Dawna Slarve,
K. S., by and through their parents and natural guardians, Nathaniel and Dawna Slarve,
Nathaniel Slarve, individually, Dawna Slarve, individually,
Plaintiffs,

v.

Heather Bouchey, in her official capacity as Interim Secretary of the Vermont Agency of
Education, Jennifer Deck Samuelson, in her official capacity as Chair of the Vermont State
Board of Education, Christine Bourne, in her official capacity as Windsor Southeast
Supervisory Union Superintendent, Hartland School Board, Randall Gawel, in his official
capacity as Orange East Supervisory Union Superintendent, Waits River Valley (Unified #36
Elementary) School Board, Jay Nichols, in his official capacity as the Executive Director of
The Vermont Principals' Association,
Defendants - Appellees.

On Appeal from the United States District Court for the District of Vermont
Case No. 2:23-cv-00652

## RESPONSIVE BRIEF OF APPELLEE
## JAY NICHOLS

Steven J. Zakrzewski
GORDON REES SCULLY MANSUKHANI
One Financial Plaza, 755 Main Street, Suite 1700
Hartford, Connecticut 06103
(860) 494-7511
szakrzewski@grsm.com

## CORPORATE DISCLOSURE STATEMENT

Under Fed. R. App. P. 26.1, Appellee, Jay Nichols, in his official capacity as Executive Director of the Vermont Principals' Association, states that they have no parent corporation, they do not issue stock, they are not a subsidiary or an affiliate of a publicly owned corporation, and there is no publicly owned corporation or its affiliate not a party to this appeal that has a financial interest in the outcome of this case.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES .................................................................. iii

I.      INTRODUCTION ................................................................1

II.     RULE 27(A)(2) STATEMENT ....................................................5

III.    COUNTERSTATEMENT OF ISSUES .........................................5

IV.     STATEMENT OF THE CASE ....................................................6

        A.      FACTUAL BACKGROUND ..................................................6

V.      ARGUMENT.....................................................................9

        A.      STANDARD OF REVIEW ....................................................9

                1.      THE DISTRICT COURT DID NOT ABUSE ITS
                        DISCRETION IN DENYING APPELLANTS'
                        MOTION FOR PRELIMINARY INJUNCTION .....................9

                        a.      Appellants Are Not Likely to Succeed on The
                                Merits of Their Free Exercise Claims. ...........................11

                        b.      Appellants Cannot Show Irreparable Harm ..................20

                        c.      Appellants Cannot Show that the Balance of the
                                Equities Tips in Their Favor...........................................22

                        d.      Appellants Cannot Show That the Public Interest
                                Would Not Be Disserved.................................................23

VI.     CONCLUSION....................................................................24

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Agudath Israel of America v. Cuomo,*
   983 F.3d 620 (2d Cir. 2020) ....................................................12, 20

*Agudath Israel of Am. v. Cuomo,*
   980 F.3d 222 (2d Cir. 2020) ...............................................................2

*Bowen v. Roy,*
   476 U.S. 693 (1986)...........................................................................20

*Cantwell v. Connecticut,*
   310 U.S. 296 (1940)...........................................................................12

*Cent. Rabbinical Cong. of U.S. & Can. v. N.Y.C. Dep't of Health &*
   *Mental Hygiene*, 763 F.3d 183 (2d Cir. 2014)...................12, 13, 14, 15

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   508 U.S. 520 (1993)..............................................................12, 14, 15

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master*
   *Fund Ltd.*, 598 F.3d 30 (2d Cir. 2010)...............................................22

*Cornerstone Christian Schools v. University Interscholastic League,*
   563 F.3d 127 (5th Cir. 2009) .............................................................20

*Emilee Carpenter, LLC v. James,*
   107 F.4th 92 (2d Cir. 2024)................................................................18

*Fellowship of Christian Athletes v. Fulton,*
   82 F.4th 664 (9th Cir. 2023) ..............................................................18

*Fulton v. City of Philadelphia,*
   593 U.S. 522 (2021)............................................. 15-16, 18, 19

*Green Haven Prison Preparative Meeting of Religious Soc'y of*
   *Friends v. N.Y. State Dept. of Corr. & Cmty. Supervision*,
   16 F.4th 67 (2d Cir. 2021) ...................................................................9

iii

*Mendez v. Banks*,
    65 F.4th 56 (2d. Cir. 2023) *cert. denied*, 144 S. Ct. 559,
    217 L. Ed. 2d 298 (2024) ............................................................9, 10

*New York Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013) .............................................................11

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010) ...............................................................10

*Tandon v. Newsom*,
    593 U.S. 61 (2021)............................................................................17

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
    60 F.3d 27 (2d Cir. 1995) .................................................................10

*Village of Willowbrook v. Olech*,
    528 U.S. 562 (2000)..........................................................................24

## Constitutions

U.S. Const. amend. I ...............................................................................12

## Statutes

20 U.S.C. § 1681(a) ...............................................................................24

28 U.S.C. § 1292 .......................................................................................5

## I.    INTRODUCTION

This appeal arises from an action by Plaintiffs-Appellants against, *inter alia*, Defendant-Appellee, Jay Nichols, in his official capacity as Executive Director of the Vermont Principals' Association (VPA), for an injunction prohibiting Appellee from enforcing the VPA's decision to expel Appellant, Mid Vermont Christian School (the "School"), from VPA membership.  The decision to expel the School, however, was justified, as the School refused to play against another team because the other team had one player who is transgender, and made public remarks negatively impacting that player and their school, in which it also confirmed in public comments that it would continue to refuse to play against transgender athletes in the future.

This decision was made because the School's actions discriminated against a member of a protected class under Vermont law, and any School that took the same actions for secular reasons would have also been expelled—indeed, the reasons that the School initially cited for its actions were not grounded in religion.  Nonetheless, the School has consistently maintained that it "believes that a person's sex cannot be chosen or changed and that the School must operate consistent with that belief." (JA889-894.) The VPA does not dispute this.  What is disputed, and what is central to this case, is that the VPA did not expel the school *because* of its religious beliefs. The VPA's decision was neither arbitrary nor made with any sort of religious

motivation, but was rather a result of the School's direct and deliberate violation of VPA rules and procedures protecting transgender students and mandating the exact disciplinary action that was taken. The record amply reflects that the VPA's decision to expel the School was a result of the School's own statements that it could not participate in a girls' basketball game with a transgender opposing player, due to concerns regarding *safety* and *fairness*, and the School's ultimate decision to publicly forfeit a scheduled playoff game because of this student's gender identity. The School initially administratively appealed its expulsion, and the VPA ultimately offered and continues to offer the School re-admission to the VPA, on the condition that the School agree to abide by *all* of the VPA's rules, policies and procedures, including its policy on gender identity, which merely seeks to promote fairness and inclusion for trans students. The VPA's policies are not arbitrarily imposed, but are required by Vermont state law, and the VPA cannot violate Vermont law.

There are many laws, policies and conditions upheld by both private and public institutions that can impact religious organizations, and the Free Exercise Clause does not allow the burdened parties to invoke constitutional protection for every rule they believe is inconsistent with their beliefs. *See Agudath Israel of Am. v. Cuomo*, 980 F.3d 222, 226 (2d Cir. 2020) ("the Free Exercise Clause does not relieve an individual of the obligation to comply with a valid and neutral law of

2

general applicability, even if the law has the incidental effect of burdening a particular religious practice") (internal quotation marks omitted).

Bypassing the administrative process of further appealing the VPA's decision, the School instead commenced the underlying action in the district court, where Appellants twice moved for a preliminary injunction. (JA184-190 and JA899-894.)  The district court denied both motions, (JA24 and JA955), finding and affirming that the School failed to establish a likelihood of success on the merits, among other reasons:

> It appears unlikely that Plaintiffs will demonstrate that they are the victims of prejudice against their religious beliefs.  Rather, it is likely that following a trial, the court will find that the state's educational policy of including of transgender students on the team of their choice is neutral as to religion and applies to all schools seeking to participate in the VPA. Similarly, it is likely that the evidence will demonstrate that the expulsion of Mid Vermont from the VPA was not motivated by animus against their religious beliefs.  Instead, the information available to the court indicates that Mid Vermont's refusal to compete in the future against schools whose teams include transgender students resulted in its expulsion.

*Id*.  Appellants then filed a motion for injunction pending appeal with this Court, which this Court denied in its August 13, 2024 Order on Motion (Dkt. Entry 41.1).

The Appellants now rely primarily on the same arguments that they made in their three prior motions:  (1) the VPA's expulsion decision was not generally applicable and neutral towards religion; (2) the lower court should have applied the

strict scrutiny standard of review; (3) the VPA's expulsion decision fails the strict scrutiny test; and (4) Appellants are entitled to a preliminary injunction.

Those arguments fail now for the same reasons they have failed in the Appellants' three prior motions for injunction. This is primarily because the VPA's expulsion decision was aligned with the policies and procedures required by Vermont state law, and the VPA's enforcement of those policies are and would be applied to every member school regardless of religious affiliation or practice(s). The rational basis review standard controls the application of these generally-applicable and facially-neutral policies.

Finally, Appellants' proposed injunctive relief is impractical and unworkable. The VPA would have to allow teams to refuse to play against other teams any time an opposing team had a player believed to be inconsistent with a team's religious beliefs, including, potentially, players of different religions or sexual orientations. This would prevent those teams from playing their full schedules—including, as in this case, playoff schedules. From a practicality standpoint, as well as an ethical one, the VPA has no way of tracking which students are transgender, or members of other protected classes, so it could not conceivably "schedule around" this issue, as Appellants suggest. More fundamentally, the Appellants' requested relief would discriminate against trans student-athletes. Appellants take great pains to classify their conduct as passive—merely wanting to

forfeit and be allowed to remain in the league—when in fact their conduct would actively deprive trans student-athletes of the ability to play a complete schedule for their schools, would also punish their teammates, subjecting the trans students to further ridicule and negative attention.

The relief that the Appellants now request, like the substantively identical motions for injunction filed both here and in the lower court, should be denied.

## II.    RULE 27(A)(2) STATEMENT

Appellee does not dispute the Court's jurisdiction over this Appeal pursuant to 28 U.S.C. § 1292 as an interlocutory appeal from a district court's denial of Appellants' motion for injunction.

## III.    COUNTERSTATEMENT OF ISSUES

The Vermont Principals' Association (VPA) expelled Mid Vermont Christian School from membership because the School directly and deliberately violated the VPA's policy regarding gender identification and inclusion.  Instead of filing a further administrative appeal from the VPA's expulsion decision, the School filed the underlying lawsuit asking the court to bar the VPA from enforcing its policy. In denying Appellants' motion for injunction, the district court correctly applied a rational basis review.  This appeal raises a single issue:

1. Whether the district court abused its discretion applying rational basis review in denying Mid Vermont Christian's motion for injunctive relief preventing the VPA from enforcing its policies against Mid Vermont Christian.

5

The answer to this question is no.

## IV.    STATEMENT OF THE CASE

### A.    FACTUAL BACKGROUND

In February 2023, the Mid Vermont Christian School's varsity girls' basketball team was scheduled to compete in a tournament playoff game against a team with a transgender student. (JA338.)  Before that game, the School contacted the VPA and asked to ban the transgender student from playing in the game. (JA233.)  The VPA denied this request, because granting it would violate the Vermont Agency of Education's Best Practices for Schools Regarding Transgender and Gender Nonconforming Students, as well as the VPA's own policies.  (JA339.) Mid Vermont Christian then refused to play the playoff game.  *Id*.

The School then reported through several media sources its decision to forfeit the playoff basketball game because of the transgender student. (JA341.)  After these public reports, Nichols and the VPA Executive Council agreed that the School should be removed from VPA activities.  (JA340.)

The School appealed this decision to the VPA Activities Standards Committee, which is the VPA body charged with initially deciding all disciplinary appeals (the "First Appeal"). (JA237-38.)  The Committee upheld the appeal because the termination did not follow VPA's process for imposing discipline. (JA237-39.)

After the First Appeal, the VPA Executive Director (Nichols) issued a notice of proposed discipline advising that the School would no longer be eligible to participate in VPA activities because it violated the VPA's policies, and the School appealed this determination (the "Second Appeal").  (JA241-43.) The Activities Standards Committee held a hearing in which the School—through legal counsel—submitted factual contentions and legal arguments. The School made it clear that it intended to boycott any future game involving a transgender opponent. *Id.* The Committee denied the Second Appeal in a written decision dated May 8, 2023. (JA245-49.)

In denying the Second Appeal, the VPA advised that the School had the right to further appeal to the VPA Board of Appeals by filing a written notice with the Executive Director within seven calendar days, pursuant to VPA Policy 12. (JA249.)  Mid Vermont Christian did not appeal the May 8, 2023, decision.  Instead, the School joined another activities association, the New England Association of Christian Schools ("NEACS"), in which the School is currently competing in interscholastic athletic events.  (JA342.)

In September 2023, while the School was already participating as a member of NEACS, the School contacted the VPA to inquire about membership.  (JA251.) In response, the VPA referred to its prior decision, noted that decision was final because it had not been appealed, and requested that the School "address in writing

how [it] intends to assure that it will meet [the policy] obligations if the School again becomes a member of the VPA." (JA253.)  Instead of providing the requested statement for the VPA's consideration, the School filed the underlying lawsuit with the District Court long after the deadline for appealing from the decision that it now challenges.  (JA1-12.)

In addition to monetary damages, Plaintiffs-Appellants originally sought a preliminary injunction against Defendant-Appellee, Jay Nichols, in essence, prohibiting the VPA from enforcing its policies and the expulsion decision.  (JA184-190.)  After full briefing and argument, the district court issued an Order on June 11, 2024 denying Plaintiffs' request for preliminary injunction.  (JA852-878.)  In denying that motion, the district court ruled that the rational basis standard should and will apply to the court's consideration of the merits of the case, holding "[t]here is no suggestion that some schools are given license to forfeit games and others not.  There is no showing of individualized exemptions from the state regulations and the rules of the VPA that would support strict scrutiny."  *Id.*

Appellants filed this interlocutory appeal from the Court's June 11, 2024 Order on June 21, 2024 (the "Appeal").  (JA886-888.)  Also on June 21, 2024, Plaintiffs-Appellants filed a Motion for Injunction Pending Appeal in the District Court.  (JA954-959.)  That motion was fully briefed and then ultimately denied by the district court on July 29, 2024.  (JA954-959.)  On July 22, 2024, Appellants

8

filed a motion for injunction pending appeal with this Court, (Dkt. Entry 41), which this Court denied in its Order dated August 13, 2024, (Dkt. Entry 41.1). Appellants then filed their brief (the "Principal Brief") with this Court on August 30, 2024, to which Defendant-Appellee, Jay Nichols, now responds.

## V.     ARGUMENT

### A.     STANDARD OF REVIEW

When a party appeals from the grant or denial of a preliminary injunction, review is for abuse of discretion. *Mendez v. Banks*, 65 F.4th 56 (2d. Cir. 2023) *cert. denied*, 144 S. Ct. 559, 217 L. Ed. 2d 298 (2024). Within that framework, a Court of Appeals will examine "the legal conclusions underpinning the decision *de novo* and the factual conclusions for clear error." *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y. State Dept. of Corr. & Cmty. Supervision*, 16 F.4th 67, 78 (2d Cir. 2021).

### 1.     THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING APPELLANTS' MOTION FOR PRELIMINARY INJUNCTION

To succeed on appeal, Appellants must demonstrate that the district court abused its discretion in denying their motion for preliminary injunction. They cannot. To obtain a preliminary injunction, Appellants must show:

> (1) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in plaintiffs' favor, (2) that they are likely to suffer irreparable injury in the absence of an injunction, (3) that the balance of hardships tips in their favor, and (4)

9

that the public interest would not be disserved by the issuance of a preliminary injunction.

*Mendez*, 65 F.4th 56, 63 (2d Cir. 2023), quoting *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010) (internal quotation marks omitted).  As this Court has held, "[t]he typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits."  *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995).  "A mandatory injunction, in contrast, is said to alter the status quo by commending some positive act."  *Id.*  "This distinction is important because [the Second Circuit has] held that a mandatory injunction should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief."  *Id*.

Appellants *do not* seek to be restored to the uncontested status that preceded the pending controversy, because that status is one in which they would participate fully in all VPA activities, regardless of the opposing teams' players' gender identities, and failed to timely appeal a decision confirming that status.  What Appellants actually seek is their ultimate relief in this case:  permission to participate only on their terms, and to freely bar teams with transgender students from competing against the School.

Appellants attempt to frame the requested relief sought as prohibitory—an order to stop the VPA, from enforcing its policies that resulted in the School's

expulsion from the Association. (Pl. Br. at 27.)  The request, however, is not for an order prohibiting an act, but rather for an order directing the performance of an act, i.e., for the VPA to affirmatively change and remodel its policies to allow an exception for the actions taken (and to be taken in the future) by Mid Vermont Christian School, which cannot be allowed.

### a.    Appellants Are Not Likely to Succeed on The Merits of Their Free Exercise Claims

Appellants' arguments on appeal are substantially identical to the arguments in their first and second requests for preliminary injunction, which the district court denied.  Further, Appellants ask this Court to reverse the district court's denial of injunctive relief for abuse of discretion, when this Court has already denied Appellants the same relief.  Appellants argue that they are likely to succeed on the merits of their free exercise claim, despite the lower court explicitly holding that "[a]pplication of a rational basis test to Vermont's policy of recognizing the gender choice of high school athletes is not likely to result in a ruling favorable to Mid Vermont." (JA876.)  The Second Circuit has held that "[c]onsideration of the merits is virtually indispensable" in the context of an alleged Constitutional violation, "where the likelihood of success on the merits is the dominant, if not the dispositive, factor."  *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).  Here, central to Appellants' arguments is whether the lower court abused its discretion in finding the facts that led it to apply the rational basis test, as opposed

to strict scrutiny, to reach its conclusion that Appellants are not likely to succeed on the merits of their Free Exercise claims.

The Free Exercise Clause of the First Amendment, applied against the states by incorporation into the Fourteenth Amendment, *see Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." *U.S. Const. Amend. I.* As the Supreme Court has instructed, however, the Free Exercise Clause "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability, and such a neutral and generally applicable policy is subject to only rational-basis review." *Agudath Israel of America v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020) (emphasis added). For the reasons stated in this brief and in the district court's June 11, 2024 Order, the rational basis test, *not* strict scrutiny review, applies to *both* the VPA's policies and enforcement of those policies. Application of the rational basis test leads to the conclusion, which the lower court correctly reached, that Appellants are not entitled to injunctive relief.

"To determine neutrality, we begin with the [policy], 'for the minimum requirement of neutrality is that a [policy] not discriminate on its face.'" *Cent. Rabbinical Cong. of U.S. & Can. v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 193 (2d Cir. 2014), quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). The VPA's policy satisfies this standard

12

by explicitly applying the gender inclusivity and anti-discrimination provisions to all member schools, public and independent, regardless of religious affiliations or beliefs:

> The Vermont Principals' Association (VPA) recognizes the value of participation in interscholastic sports for all student-athletes. The VPA is committed to providing all students with the opportunity to participate in VPA activities in a manner consistent with their gender identity as outlined in the Vermont Agency of Education Best Practices For Schools For Transgender And Gender Nonconforming Students, Vermont's Public Accommodations Act (9 V.S.A. 4502) and VPA policies prohibit discrimination and/or harassment of students on school property or at school functions by students or employees. The prohibition against discrimination includes discrimination based on a student's actual or perceived sex and gender. Gender includes a person's actual or perceived sex as well as gender identity and expression.

JA138-176. This policy is, on its face, neutral towards religion. The district court agreed, holding that "the state's regulations concerning transgender athletes apply to all schools, public and independent. That enforcement only results in the expulsion of schools that are offended by the participation of transgender athletes does not diminish the general application of the state's policy." (JA874.)

Similarly, the VPA's enforcement of its policy was and is neutral. To claim otherwise Appellants would need to establish that the VPA's actions purposely and exclusively applied only to them as *religious actors*, *see Central Rabbinical Congress*, 763 F.3d at 196, which they cannot do. The record establishes that the first communication from Mid Vermont Christian to the VPA seeking permission

to forfeit the basketball playoff game—which the VPA denied based on its policy—cited to the School's physical fairness and safety concerns only—both secular concerns—and made no reference at all to religious beliefs:

> On February 16, 2023, Mid Vermont wrote to the VPA about its concern that 'there is a biological male playing on the girls' basketball varsity team at The Long Trail School.' (Doc. 14-7 at 2.) Mid Vermont requested that 'if we end up being their opponent in the State Tournament, that the biological male would not be allowed to play.' (*Id*.) The letter identified the 'clear advantage [males have] over females in the physical realm, namely size, speed, quickness, strength, muscle mass, bone density, lung capacity, etc.' (*Id.*) It stated that girls playing on Mid Vermont's team were 'extremely uncomfortable playing a contact sport with a member of the opposite sex both for reasons of safety and overall uncomfortableness of the proximity and contact necessary to play this sport to its fullest.' (*Id.*).

JA863. The VPA's actions in response to the School are exactly what would happen if *any member school* were to seek exclusion from the VPA's policies on gender inclusivity. The policies are applied to every member school, regardless of religious beliefs and practices, and do not single out any individual or member school to impede religious speech or exercise. The VPA's enforcement of its policy was and is neutral.

The VPA's policy, and its actions in enforcing the policy, are also generally applicable. "The general applicability requirement prohibits the government from 'in a selective manner, imposing burdens only on conduct motivated by religious belief.'" *Central Rabbinical Congress*, 763 F.3d at 197, quoting *Lukumi*, 508 U.S. at 543. "A law is therefore not generally applicable if it is substantially

underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it." *Id*. at 535-38. The argument ends here. Appellants cannot claim that their religious beliefs are the only beliefs affected by or offended by the VPA's gender inclusivity policy. There are likely other individuals and organizations that could and indeed may object to the decision to allow a transgender player on a girls' basketball team for reasons not based in religion at all. If a secular team had refused to play against a trans student because of non-religious disagreement with that student's identity, the result would have been the same, and Appellants have no evidence to the contrary.

The VPA is not "imposing burdens only on conduct motivated by religious belief," *Central Rabbinical Congress*, 763 F.3d at 197, and thus its policy and its enforcement of its policy are generally applicable. Whether the VPA's policy burdens Plaintiffs' religious conduct is not dispositive: "[t]hat enforcement only results in expulsion of schools that are offended by the participation of transgender athletes does not diminish the general application of the state's policy." (JA874.) In short, the Plaintiffs have not and cannot show that the policy is applied differently to religious schools than it is to any other schools, and that is fatal to their argument.

Appellants also argue that the VPA's *policies* are not generally applicable because they include "a mechanism for individualized exemptions," quoting *Fulton*

15

*v. City of Philadelphia*, 593 U.S. 522, 533-34 (2021). (Pl. Br. 36.) What *Fulton* actually holds is that "*[e]nforcement* of a policy is not generally applicable if the policy provides a mechanism for individualized exceptions" (emphasis added). Appellants relatedly argue that because the VPA's gender identification *policy* creates a "formal mechanism for granting exceptions," it thus "renders [the] policy not generally applicable." *Id*. Again, Appellants misread the policy and the law. The VPA's gender identity policy expressly provides that "*participation* by transgender athletes will be resolved on a case-by-case basis," which allows the VPA to ensure that the transgender student has made a bona fide request to participate—in practice, the VPA has encountered no such issues. (*See* JA142.) Nowhere in the policy does the VPA provide for a case-by-case granting of exceptions for *enforcement* of the policies themselves. Again, Appellants conflate the availability of a case-by-case assessment of whether trans *students* can participate on teams matching their gender identities with the assessment of whether *schools* should be allowed to forfeit games because they believe that students, who are members of a protected class, are in some way inconsistent with their beliefs. None of the VPA's policies allow discretion with respect to the latter, whether for religious or secular reasons. And the governmental interest in promoting student participation is different from the interest in preventing discrimination against

16

students, justifying different treatment under *Tandon v. Newsom*, 593 U.S. 61, 62 (2021).

The district court addressed each and every argument Appellants present here on appeal, yet Appellants again attempt to combine the VPA's fairness and safety policy regarding gender-specific teams and the policy on gender identification.

> The examples of individualized exemptions offered by Mid Vermont are not persuasive. Of course, the decision about whether a transgender student should be allowed to try out for the girls' basketball team is an individualized decision about that athlete. No one claims otherwise. But that is not the decision in dispute. The decision in dispute is Mid Vermont's decision to refuse to play against teams that include such an athlete. There is no suggestion that some schools are given license to forfeit games and others not. There is no showing of individualized exemptions from the state regulations and the rules of the VPA that would support strict scrutiny.

(JA874.)

Moreover, Appellants' claim that the VPA issued individualized exceptions to its policy for teams amid the COVID-19 pandemic—which Appellants rely upon heavily in their Principal Brief—is equally unavailing. Appellee does not deny that three schools forfeited girls' basketball games because an opposing player was exempt from a league-wide mask requirement, and those schools were not expelled. However, as the District Court observed, "[a] health concern in the midst of the fear and caution that gripped us during the COVID emergency is scant evidence that the VPA and Agency applies its policies concerning transgender athletes on an individualized basis." *Id*. Further, the actions at issue are not "comparable" under

17

*Tandon,* 593 U.S. 61, 62 (2021), because, during the pandemic, there was a legitimate public health concern associated with being in close quarters with mask-less persons. There were, therefore, "bona fide public policy reasons" to justify allowing these forfeits, per *Emilee Carpenter, LLC v. James*, 107 F.4th 92, 111 (2d Cir. 2024). The VPA has never allowed a team to simply forfeit because they ideologically disagreed with the identity of a player on the opposing team, whether for secular or religious reasons.[1]

Appellants further argue that *Fellowship of Christian Athletes v. Fulton*, 82 F.4th 664 (9th Cir. 2023), cited by Appellants in the two district court motions, their motion for injunction pending appeal and now their Principal Brief, instructs the application of strict scrutiny. *Fulton* is a case in which a divided Ninth Circuit en banc held that a school district's revocation of a religious student organization's status as an official student club likely violated the organization's free exercise rights. *Id*. at 695-96. This crux of the case was that the school would not recognize a Christian student club that refused to repudiate its beliefs and admit all comers

---

[1] To the extent that the Appellants argue that the VPA sanctioned disability discrimination by allowing these forfeits, that argument is incorrect. First, there is no evidence on which the district court or this Court could determine whether the students involved in the underlying games were disabled. Second, there is no evidence that any schools were refusing to play against students *because of* their disabilities, but rather the evidence on record shows that schools were declining to play against unmasked students out of fear that their own students could contract a highly contagious disease in the midst of an unprecedented public health crisis.

*within its own club.* *Id.* This stands in stark contrast to the present case, where the School's actions are directly targeting at transgender players *from other schools*. The VPA has not, and will not, attempt to burden the School's rights to administer itself, but cannot allow the School to impose its own standards, which are inconsistent with Vermont law, on other schools and other students.

Drilling down on the "All-Comers Policy" in *Fulton*, that policy prevented student clubs from enacting discriminatory membership and leadership criteria but "carved out several exceptions." *Id*. at 678. That court found that "[d]espite the All-Comers Policy, schools in the District were allowed to maintain–or even themselves sponsor–clubs with facially discriminatory membership requirements," including a club for "seniors who identify as female" and a club "prioritize[ing] acceptances of [S]outh Asian students." *Id*. at 689-90. This case is simply inapplicable here, where the school district was allowing secular activity that was comparable to the disparate treatment of individuals based upon their sexual orientation by the religious student organization. Here, in contrast, the VPA provides no exceptions to enforcement against member schools of the policies at issue.

Nor is there any basis for the School's claims that it suffered as a result of being denied a "waiver of VPA policies." (Pl. Br. 41.) The record reflects that the VPA offered several alternative options which would allow the School to continue

participating in VPA-sponsored activities, and even went as far—for the first time ever—as offering the School a "limited membership" for purposes of participating in specific co-educational activities, which the School recently accepted. (JA981-983.) The VPA cannot, however, be required to permit schools, religious or secular, to freely refuse to play against trans students. In addition to marginalizing them and placing them under an unnecessary spotlight of negative attention, it is well established that "the First Amendment does not 'require the Government itself to behave in ways that the individual believes will further his or her spiritual development or that of his or her family.'" *Cornerstone Christian Schools v. University Interscholastic League*, 563 F.3d 127, 136 (5th Cir. 2009), quoting *Bowen v. roy,* 476 U.S. 693, 699 (1986).

### b.    Appellants Cannot Show Irreparable Harm

In their various motions to the district court, and now again in their Principal Brief, Appellants offered the argument that "[r]eligious adherents are not required to establish irreparable harm independent of showing a Free Exercise Clause violation because a presumption of irreparable injury flows from a violation of constitutional rights," by citing to the principle delineated by this Court in *Cuomo*, 983 F.3d at 636. However, Appellants simply cannot compare *their own* outright refusal to participate in interscholastic sports due to the gender identification of an opposing team's player to a governmental policy fixing capacity limits on churches

20

and restricting willing parishioners from attending church services. The district court provided a thoughtful analysis on Appellants' claims of irreparable harm, ultimately concluding that Appellants were not without workable options:

> Faced with the presence of a transgender student on an opposing team, the school had choices. It could have explained to its students that the world holds many forms of belief and behavior, not all of which are universally accepted, and that playing basketball with a transgender student was no endorsement of their gender identity.

(JA877.) It is undisputed that the ability to attend services and worship is protected by the Free Exercise Clause. What is disputed is the notion proffered by Appellants that their own refusal to participate in interscholastic sports against certain students is a constitutionally protected religious practice that is being unduly restricted by the VPA. Playing against a different team with different beliefs, with players that the School would not admit on its own teams, does not burden the School's religious beliefs or practices.

As for Appellants' attempt to find support in *Cuomo*'s holding that "religious adherents are not required to establish irreparable harm independent of showing a Free Exercise Clause Violation," this Court noted that "Orthodox Jews are obligated to have an in-person minyan—a quorum—before some of Judiasm's most sacred rituals." *Id*. Moreover, "Orthodox Jews also desist from using electronics on Shabbat, so in-person gatherings are necessary for Agudath Israel's congregants. Appellants have demonstrated irreparable harm that would result without a

21

preliminary injunction against enforcement of the Order's fixed capacity limits on houses of worship." *Id*.  In contrast, Appellants do not articulate the actual religious practice being restricted by the VPA's *enforcement* of its policies.  Indeed, Appellants are not even arguing that playing against only teams *without* a transgender player is a religious practice.  Aside from their stated belief that playing against transgender players would be propagating a lie against their religion, there is no support for this argument and it must fail.

### c. Appellants Cannot Show that the Balance of the Equities Tips in Their Favor

No matter how the Appellants characterize their position, the VPA should not be forced to sanction the exclusion of trans students from athletic competitions. This would contravene state law, federal law, and a great body of medical guidance. *See Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n. 4 (2d Cir. 2010).

The District Court's June 11, 2024 Order provided a thorough analysis of the equities and concluded that they do not tip in the School's favor:

> Mid Vermont has been candid with the Agency and the court about its decision to withdraw from any single sex competition in which a transgender student participates, now and in the future. Mid Vermont seeks a procedure under which it chooses which games it will contest and which it will sit out, based on what it hears about the gender choices of students on the other team. The VPA has rejected this proposed procedure. As its denial of Mid Vermont's appeal illustrates, it has concerns over the consequences to other schools and transgender

22

athletes of allowing Mid Vermont to shun a transgender student in a public act of forfeiture.

*Id.* To tip the equities in Appellants favor would result in innumerable instances of discrimination against trans players—and potentially players in other protected classes— for an immeasurable amount of time. This should not be sanctioned and would contravene the purpose of the policies enacted by the Vermont Agency of Education, from which the VPA's policies were derived.

### d. Appellants Cannot Show That the Public Interest Would Not Be Disserved

Nor can Mid Vermont Christian show that the injunctive relief requested is in the public interest. Appellants' Principal Brief is replete with statements about how unfair it is to be subjected to the same policies as every other member school when Mid Vermont Christian is a Christian school and thus should be allowed exceptions. However, what also must be weighed is the interest held by the VPA, which the district court succinctly articulated:

> It is sufficient to uphold the implementation of [the VPA's] policies to recognize that the state has a legitimate interest in extending the protection of inclusion to transgender students and has concluded that the better course is to permit them to participate in girls' sports (or boys) despite their sex assigned at birth.

(JA877.) In reality, the VPA could not legally provide the relief that the Appellants are seeking. Appellants do not want to play against trans students, so they are asking the VPA to either prevent those students from playing or at least to prevent them from playing against Mid Vermont Christian School, and treating those trans girls

23

differently from other girls would violate Vermont law, which protects trans people from discrimination. In fact, different treatment of a trans child potentially violates both the Equal Protection clause and Title IX, and certainly violates Vermont's Public Accommodations Act. The essence of an equal protection claim is that someone has been treated differently from another without sufficient justification. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Title IX says "[n]o person … shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Here, the School is asking the VPA to sanction a system in which a trans child and their entire team would be left unable to play any other school taking issue with the trans child's gender identity. That result was not sanctioned by the lower court, and should not be sanctioned by this Court.

## VI.    CONCLUSION

For the reasons set forth above this Court should affirm the district court's order denying Appellants' motion for preliminary injunction.

Respectfully submitted,

THE APPELLEE,
**Jay Nichols, in his official capacity as Executive Director of the Vermont Principals' Association,**
By its Attorneys,

Dated:      October 15, 2024

/s/ Steven J. Zakrzewski
Steven J. Zakrzewski, Esq.
GORDON REES SCULLY MANSUKHANI, LLP
95 Glastonbury Blvd., Suite 206
Glastonbury, CT 06033
T: (860) 494-7511
szakrzewski@grsm.com

## CERTIFICATE OF COMPLIANCE

This Brief complies with the type-volume limit set forth in Fed. R. App. 27(d) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 5,850 words.

This Brief also complies with the typeface requirements of Fed. R. App. P. 27(d) and 32(a) and the type-style requirements of Fed. R. App. P. 32(a) because it has been prepared in a proportionally spaced typeface using Microsoft Word 360 in 14-point Times New Roman type-style.


Dated: October 15, 2024


/s/ Steven J. Zakrzewski
Steven J. Zakrzewski

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2024, a copy of this Brief was filed electronically with the Clerk of the Second Circuit Court of Appeals.  Service on counsel for all parties will be accomplished through the Court's electronic filing system.

/s/ Steven J. Zakrzewski
Steven J. Zakrzewski