# 24-1704

---

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

MID VERMONT CHRISTIAN SCHOOL, on behalf of itself and its students and its students' parents; A.G. and M.G., by and through their parents and natural guardians, Christopher and Bethany Goodwin; CHRISTOPHER GOODWIN, individually; and BETHANY GOODWIN, individually,

*Plaintiffs-Appellants,*

v.

ZOIE SAUNDERS, in her official capacity as Secretary of the Vermont Agency of Education; JENNIFER DECK SAMUELSON, in her official capacity as Chair of the Vermont State Board of Education; CHRISTINE BOURNE, in her official capacity as Windsor Southeast Supervisory Union Superintendent; HARTLAND SCHOOL BOARD; RANDALL GAWEL, in his official capacity as Orange East Supervisory Union Superintendent; WAITS RIVER VALLEY (UNIFIED #36 ELEMENTARY) SCHOOL BOARD; and JAY NICHOLS, in his official capacity as the Executive Director of The Vermont Principals' Association,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the District of Vermont
Case No. 2:23-cv-00652

---

## REPLY BRIEF OF APPELLANTS
## MID VERMONT CHRISTIAN SCHOOL, A.G. AND M.G.,
## AND CHRISTOPHER AND BETHANY GOODWIN

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

David A. Cortman
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org

James A. Campbell
Christopher P. Schandevel
Jacob E. Reed
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jcampbell@ADFlegal.org
cschandevel@ADFlegal.org
jreed@ADFlegal.org

Ryan J. Tucker
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rtucker@ADFlegal.org

*Counsel for Appellants*

# TABLE OF CONTENTS

Table of Authorities.................................................................. iii

Argument.................................................................................1

I.   The VPA's decision to expel Mid Vermont in retaliation for
     its religiously motivated forfeit of a single girls' basketball
     game was not neutral or generally applicable..................................1

     A.   As the VPA concedes, it has allowed other schools to
          forfeit games to avoid competing against a specific
          player on the opposing team for secular reasons. .................3

     B.   As the VPA concedes, schools can prevent students
          from playing on teams consistent with their gender
          identity altogether for secular reasons.................................8

     C.   The VPA's individualized assessment of eligibility
          decisions and waiver requests also prove that the
          relevant policies are not generally applicable. .................... 10

     D.   Five factors combine to show that the VPA has not
          been neutral toward Mid Vermont's religion, and the
          VPA's response barely addresses any of the five................ 12

          1.   The disconnect between VPA policies and state law... 13

          2.   The VPA's refusal to consider a compromise .............. 14

          3.   The VPA's statements showing religious hostility...... 15

          4.   The severity of the VPA's imposed penalty ................ 17

          5.   The effect of the VPA's enforcement decisions ............ 18

II.  Excluding Mid Vermont from a public benefit also triggers
     strict scrutiny, and the School Defendants' conclusory claim
     that VPA membership is not a public benefit fails. ...................... 22

i

III.   Mid Vermont is likely to succeed because the VPA cannot
       satisfy strict scrutiny—which the VPA does not deny—and
       the other factors thus favor an injunction. ................................... 26

Conclusion ........................................................................... 29

Certificate of Compliance ....................................................... 31

Certificate of Service .............................................................. 32

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*303 Creative LLC v. Elenis,*
    600 U.S. 570 (2023) ........................................................... 6

*Brentwood Academy v. Tennessee Secondary School Athletic Association,*
    531 U.S. 288 (2001) ......................................................... 24

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018) ........................................... 4

*Carson v. Makin,*
    596 U.S. 767 (2022) ................................................. 22, 25

*Central Rabbinical Congress of United States & Canada v. New York City Department of Health & Mental Hygiene,*
    763 F.3d 183 (2d Cir. 2014) ........................................... 18

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ...................................... 4, 17, 18, 28

*Emilee Carpenter, LLC v. James,*
    107 F.4th 92 (2d Cir. 2024) ......................................... 4, 5

*Espinoza v. Montana Department of Revenue,*
    591 U.S. 464 (2020) ................................................. 22, 25

*Everson v. Board of Education of Ewing Township,*
    330 U.S. 1 (1947) ............................................................ 23

*Fellowship of Christian Athletes v. San Jose Unified School District Board of Education,*
    82 F.4th 664 (9th Cir. 2023) (en banc) ...................... 9, 10

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021) ........................................... 10, 11, 12

*Kennedy v. Bremerton School District,*
    597 U.S. 507 (2022) ........................................................ 21

iii

*Lyng v. Northwest Indian Cemetery Protective Association,*
 485 U.S. 439 (1988) ........................................................26

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
 584 U.S. 617 (2018) ......................................... 17, 21, 29

*Mastrio v. Sebelius,*
 768 F.3d 116 (2d Cir. 2014) (per curiam).....................27

*McDaniel v. Paty,*
 435 U.S. 618 (1978) ........................................................26

*New Hope Family Services, Inc. v. Poole,*
 966 F.3d 145 (2d Cir. 2020)................................... passim

*North American Soccer League, LLC v. United States Soccer
 Federation, Inc.,*
 883 F.3d 32 (2d Cir. 2018)............................................27

*Sherbert v. Verner,*
 374 U.S. 398 (1963) ........................................................26

*Tandon v. Newsom,*
 593 U.S. 61 (2021) (per curiam) .........................3, 4, 5, 8

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
 582 U.S. 449 (2017) ................................... 22, 23, 25, 26

*We The Patriots USA, Inc. v. Connecticut Office of Early Childhood
 Development,*
 76 F.4th 130 (2d Cir. 2023) .............................................5

## Statutes

9 V.S.A. § 4502.................................................................13

## Other Authorities

Alec Schemmel, *Districts cancels girls volleyball games against
 school with trans player, cites safety concerns,* The National
 News Desk (Oct. 18, 2022) .............................................20

iv

Alec Schemmel, *Injured volleyball player speaks out after alleged transgender opponent spiked ball at her,* ABC 13 News (Apr. 20, 2023) ...................................................................... 20

Benjamin Rosenberg, *MVCS girls basketball forfeits playoff game rather than compete against team with transgender player*, Valley News (Feb. 25, 2023) ........................................... 19

Brandon Canevari, *Long Trail School pulls off comeback*, Bennington Banner (Dec. 15, 2023) ............................... 21

Elizabeth Troutman Mitchell, *Christian School Punished for Forfeiting Game With 'Transgender' Player, Though a Dozen Women's Teams Won't Play Biological Males*, The Daily Signal (Nov. 1, 2024) ...................................................... 20

Peter D'Auria, *Vermont religious school that refused to play team with trans player banned from sporting events*, VTDigger (Mar. 13, 2023) ................................................................ 18

# ARGUMENT

## I.   The VPA's decision to expel Mid Vermont in retaliation for its religiously motivated forfeit of a single girls' basketball game was not neutral or generally applicable.

The Vermont Principals' Association expelled Mid Vermont Christian School from its membership after the School forfeited a single girls' basketball game. Mid Vermont and its administrators, coaches, players, and parents believed that competing against a male athlete in a girls' basketball game would send the message that a boy really can become a girl. And for religious reasons, they did not want to express, support, or participate in that message. So Mid Vermont made the difficult decision to forfeit the game, ending its season prematurely. In response to that religious exercise, the VPA expelled Mid Vermont and *all* its teams—even its academic teams—from all VPA activities. According to VPA Executive Director Jay Nichols, that action was unprecedented.

On appeal, the VPA defends its decision by insisting that it is enforcing neutral and generally applicable policies. But the VPA concedes it allowed multiple schools to forfeit games to avoid playing against a girls' basketball player who had an exemption from a mask mandate. It concedes schools have discretion to prevent students from playing on teams consistent with their gender identity altogether. And it offers no response to the indicators of non-neutrality Mid Vermont highlighted in its opening brief.

1

What's more, the VPA's asserted interests ring hollow given its concessions about the kinds of secular activity it willingly tolerates. It has claimed that it "recognizes the value of participation in interscholastic sports for *all* student-athletes." JA142 (emphasis added). It says that "[s]tudents must be able to participate in Association-sponsored activities in an environment that is free of sexual harassment, prejudice, and discrimination." *Id.* And it asserts that "*all* individuals should be treated with dignity, fairness, and respect." *Id.* (emphasis added). The VPA also believes that "[n]o Vermont student should have to fear that by virtue of their presence their team may be denied the opportunity to play a game." JA245–46, 486. And yet, the VPA stood idly by as teams forfeited games to avoid a single unmasked player. JA50, 340; Opening Br. 11–13. And even the VPA's asserted interest in letting students compete consistently with their gender identity falls flat given its concession that schools have the discretion, on a case-by-case basis, to prevent that from happening.

Against this backdrop, the VPA's expulsion decision was neither neutral nor generally applicable. And the district court abused its discretion by refusing to apply strict scrutiny—which the VPA has not even claimed it can satisfy. This Court should reverse the decision below and order the district court to enter a preliminary injunction allowing Mid Vermont to rejoin the VPA while the case proceeds on remand.

### A. As the VPA concedes, it has allowed other schools to forfeit games to avoid competing against a specific player on the opposing team for secular reasons.

State action and enforcement decisions "are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam). "It is no answer that a State treats some comparable secular [entities] or other activities as poorly as or even less favorably than the religious exercise at issue." *Id.*

Applying these principles here, the VPA's decision to expel Mid Vermont is "not neutral and generally applicable, and therefore [it] trigger[s] strict scrutiny," because the VPA treated multiple schools' secular decisions to forfeit games to avoid playing an unmasked player "more favorably than [Mid Vermont's] religious exercise." *Id.* It makes no difference that the VPA says "the result would have been the same" if a "secular team had refused to play against a trans student because of non-religious disagreement with that student's identity." Nichols' Resp. Br. 15. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Tandon*, 593 U.S. at 62. And the VPA "has repeatedly described [its] interests … using broad terms that apply equally to decisions to forfeit games to avoid playing against a player" with a mask exemption. Opening Br. 32.

On appeal, the VPA concedes that it "does not deny that three schools forfeited girls' basketball games because an opposing player was exempt from a league-wide mask requirement, and those schools were not expelled." Nichols' Resp. Br. 17. But the VPA argues that those forfeits are not "comparable" under *Tandon* because those schools had a better reason to forfeit those games: "[D]uring the pandemic, there was a legitimate public health concern associated with being in close quarters with maskless persons." *Id.* at 18. "There were, therefore, 'bona fide public policy reasons' to justify allowing these forfeits, per *Emilee Carpenter, LLC v. James*, 107 F.4th 92, 111 (2d Cir. 2024)." *Id.*

That argument badly misreads *Emilee Carpenter*. Courts can't get around *Tandon*'s secular-comparators analysis by invoking "bona fide public policy reasons" for privileging secular conduct. The government tried that argument in *Lukumi*, and it didn't work. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 544 (1993) (rejecting claims that it was "self-evident" that killing animals for food was "important," that eradicating insects and pests was "obviously justified," and that euthanizing excess animals "[made] sense").

"Protecting religious liberty and conscience is obviously in the public interest." *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018). So public-policy reasons for allowing secular conduct aren't enough. What counts is whether the activities are comparable "judged against the asserted government interest." *Tandon*, 593 U.S. at 62.

4

On that score, *Emilee Carpenter* says only that secular activity might not be comparable if there are legitimate public-policy reasons why the secular conduct does not undermine the "asserted government interest." 107 F.4th at 111 (quoting *Tandon*, 593 U.S. at 62). Here for example, the VPA claims an interest in ensuring that students are "able to participate in Association-sponsored activities in an environment that is free of sexual harassment, prejudice, and discrimination." JA142. To further that interest, it allows schools to separate sports teams based on sex because there are "traditional boys-dominated sports," and schools "need to protect opportunities for girl athletes." JA159–60. Applying *Emilee Carpenter*'s reasoning, allowing that sex-based separation doesn't trigger strict scrutiny because allowing sex-separated sports teams *furthers* the VPA's interest in ensuring equal participation in VPA activities.[1] Indeed, *failing* to preserve sex-separated sports teams would directly undermine that interest.

But the same cannot be said of the VPA's failure to ensure an equal opportunity to participate for the student suffering from one of the "rare conditions" justifying an exemption from the mask mandate. Add.11. The VPA tries to claim that situation is different because there was "no evidence that any schools were refusing to play against

---

[1] *Accord We The Patriots USA, Inc. v. Conn. Off. of Early Childhood Dev.*, 76 F.4th 130, 153 (2d Cir. 2023) (explaining that granting medical exemptions to students who would be hurt by vaccination "advance[s] the State's interest in promoting health and safety").

students *because of* their disabilities." Nichols' Resp. Br. 18 n.1. Instead, they were "declining to play against unmasked students out of fear that their own students could contract a highly contagious disease." *Id.*

But the same reasoning applies equally to Mid Vermont's decision to forfeit its game against Long Trail. Mid Vermont did not forfeit because of a player's gender identity. It forfeited because its religious beliefs prohibit it from conveying the message that males can become females, and because its beliefs require it to protect its female players' safety. JA21–22, 233, 238, 242, 355. That is a meaningful distinction. In *303 Creative LLC v. Elenis*, the Supreme Court rejected the argument that Lorie Smith objected to the "protected characteristics" of certain customers because—as the parties stipulated—she would have gladly created graphics and websites for those customers if the graphics and websites did not express messages that violated her beliefs. 600 U.S. 570, 594 (2023). Likewise here, Mid Vermont will gladly compete "against transgender students in co-educational competitions and activities," JA967, because competing in co-ed activities does not force the School to "affirm something that violates [its] religious beliefs," JA242.

It is irrelevant that the VPA "has never allowed a team to simply forfeit because they ideologically disagreed with the identity of a player on the opposing team." Nichols' Resp. Br. 18. This case is not about ideological disagreement. Mid Vermont can compete against teams and players holding different ideological views without violating its beliefs.

6

What Mid Vermont cannot do is compete against a male athlete "in a league reserved for females" because doing so would "affirm" a message "that violates [its] religious beliefs—i.e., that the males who play in the girls' league are females." JA242. And it would force Mid Vermont to put its girls "in an unsafe situation," which also would violate the School's beliefs. JA238.

In sum, the VPA allows schools to forfeit for secular reasons—when the justification is based on "fear" of contracting a disease—but not for religious reasons—when the justification is based on the religious need to avoid espousing a false view of sex to the world. Both types of forfeits flout the VPA's asserted interests in ensuring equal participation opportunities, but only the school with the religious justification is punished. The VPA might believe that a school's fears about contracting COVID *outweigh* the resulting harm to the VPA's interest in protecting students from having "to fear that by virtue of their presence their team may be denied the opportunity to play a game." JA486. But the VPA cannot hold that position while expelling Mid Vermont for its comparable religious activity without satisfying strict scrutiny.

**B.    As the VPA concedes, schools can prevent students from playing on teams consistent with their gender identity altogether for secular reasons.**

For many of the same reasons, the VPA's concession that it lets schools decide on a case-by-case basis not to allow students to compete on teams consistent with their gender identity triggers strict scrutiny. Nichols' Resp. Br. 16. That concession follows from the Vermont Agency of Education's "Best Practices for Schools Regarding Transgender and Gender Nonconforming Students," which states that while students "[g]enerally" should be allowed to compete consistent with their gender identity, requests must be "resolved on a case-by-case basis." JA123.

According to the VPA, this discretion "allows [it] to ensure that the transgender student has made a bona fide request to participate." Nichols' Resp. Br. 16. But the VPA does not explain what a "bona fide request" entails. *Id.* It simply reserves that discretion to itself and local school officials. And it argues that schools keeping students off their own teams altogether is different from forfeiting individual games to avoid playing against players on opposing teams. *Id.* at 16, 18–19.

Again, though, "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Tandon*, 593 U.S. at 62. And keeping a student from playing altogether undermines the VPA's interest in maximizing every student's opportunity to play far more than Mid Vermont's decision to forfeit a single game did.

8

Unable to rebut that, the VPA argues that Mid Vermont "conflate[s] the availability of a case-by-case assessment of whether trans *students* can participate on teams matching their gender identities with the assessment of whether *schools* should be allowed to forfeit games" against students who identify as transgender. Nichols' Resp. Br. 16. But that's a distinction without a difference. If anything, keeping a student who identifies as transgender off the team entirely undermines the VPA's asserted interests to a much greater degree than Mid Vermont's religious exercise. And the VPA's concession that it would tolerate one but not the other is enough to trigger strict scrutiny.

Finally, regardless of what the VPA might mean when it claims it only allows schools to prevent players from playing on teams consistent with their gender identity "to ensure that the transgender student has made a bona fide request to participate," Nichols' Resp. Br. 16, the VPA's "alleged good intentions do not change the fact that it is treating comparable secular activity more favorably than religious exercise," *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 688 (9th Cir. 2023) (en banc) (*FCA*). The VPA might think it has sufficiently good reasons for allowing one but not the other. But that differential treatment of secular and religious activity triggers strict scrutiny, nonetheless.

### C.   The VPA's individualized assessment of eligibility decisions and waiver requests also prove that the relevant policies are not generally applicable.

The VPA's concession that it retains the discretion to allow schools to decide "whether trans *students* can participate on teams matching their gender identities" triggers strict scrutiny for an additional reason. Nichols' Resp. Br. 16. It provides "a mechanism for individualized exemptions." *Fulton v. City of Phila.*, 593 U.S. 522, 533 (2021) (cleaned up). It doesn't matter that "the VPA has encountered no such issues." Nichols' Resp. Br. 16. A "formal mechanism for granting exceptions renders a policy not generally applicable, regardless [of] whether any exceptions have been given, because it invites the government to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton*, 593 U.S. at 537 (cleaned up).

And that's true, too, of the VPA's ability to grant waivers of its policies. JA152. The VPA's policies state broadly that "waiver requests may be approved by the VPA Office or may be referred to the VPA Activity Standards Committee for consideration." *Id.* And member schools can appeal requests denied by the VPA Office to the Activity Standards Committee. *Id.* Such "broad discretion to grant exemptions on less than clear considerations removes [the VPA's] policies from the realm of general applicability and thus subjects the policy to strict scrutiny." *FCA*, 82 F.4th at 688.

On appeal, the VPA denies it has the discretion to allow schools "to forfeit games because they believe that students, who are members of a protected class, are in some way inconsistent with their beliefs." Nichols' Resp. Br. 16. There are two problems with that "disavowal."

First, that's not the basis for Mid Vermont's accommodation request. Mid Vermont doesn't generally object to competing against students who identify as transgender. For example, it does not object to competing in co-ed competitions and activities, JA967, which is why the VPA (under court pressure) ultimately allowed Mid Vermont to start competing again in co-ed activities like geography and spelling bees, JA965, 982–83. Instead, Mid Vermont objects to competing against students of one sex in a league reserved for students of the opposite sex because doing so would force it to "affirm something that violates [its] religious beliefs." JA242. So the VPA's denial doesn't even encompass Mid Vermont's request.

Second, the VPA's denial only disclaims the discretion to allow schools to forfeit games based on their beliefs. The VPA does *not* deny that it has discretion to allow teams to forfeit games to avoid playing against a player who identifies as transgender for purely secular reasons like fairness and safety. It may claim that it would never grant such an exception. But again, that doesn't matter under *Fulton.* 593 U.S. at 533. The mere fact that the VPA *has* discretion is enough to trigger strict scrutiny. *Id.*

11

On its plain text, the VPA's waiver policy gives the VPA discretion to grant Mid Vermont's accommodation request. JA152. The VPA does not (and cannot) deny that its policy is stated broadly enough to give it that discretion. Indeed, the VPA has already exercised its discretion by allowing Mid Vermont to assign its own teams consistent with sex rather than gender identity. Nichols' Resp. Br. 19; JA468. The mere possibility of such exceptions destroys general applicability by inviting "the government to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton*, 593 U.S. at 537. And that's true "regardless [of] whether any exceptions have been given." *Id.*

### D. Five factors combine to show that the VPA has not been neutral toward Mid Vermont's religion, and the VPA's response barely addresses any of the five.

A state actor like the VPA "fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533. In its opening brief, Mid Vermont highlighted this Court's decision in *New Hope Family Services, Inc. v. Poole*, 966 F.3d 145 (2d Cir. 2020), and the "combined effect of five factors" showing that "the VPA failed to act neutrally" when it punished Mid Vermont for its religious exercise. Opening Br. 43 (quoting *Fulton*, 593 U.S. at 533). The VPA spends roughly a page arguing that "the VPA's enforcement of its policy was and is neutral," but it barely responds to any of those five factors. Nichols' Resp. Br. 13–14.

### 1. The disconnect between VPA policies and state law

"*First*, suspicion is raised by an apparent disconnect between" the VPA's enforcement of its gender-identity policy and the law that policy "purports to implement," Vermont's Public Accommodations Act, 9 V.S.A. § 4502. *New Hope*, 966 F.3d at 165. "Mid Vermont does not qualify as a public accommodation, and even if [it] did, nothing in the Act indicates that forfeiting a basketball game somehow violates the Act." Opening Br. 44; *accord* JA38 n.3. Mid Vermont was not even scheduled to host the game it chose to forfeit. Opening Br. 44.

The VPA offers no response to that disconnect. Nichols' Resp. Br. 13–14. Elsewhere in its brief, the VPA baldly asserts that "different treatment of a trans child … certainly violates Vermont's Public Accommodations Act." *Id.* at 24. But that conclusory statement doesn't show that a forfeit for religious reasons violates the Act.

So the VPA pivots and says that "different treatment of a trans child potentially violates both the Equal Protection clause and Title IX." *Id.* The VPA explains that an equal-protection violation occurs when "someone has been treated differently from another without sufficient justification." *Id.* But (1) Mid Vermont is not a state actor subject to the Equal Protection Clause; (2) Mid Vermont did not treat a single student differently from other students—it chose not to play against a team; and (3) a *male* athlete is not similarly situated to the *female* athletes on both teams. The VPA says nothing about any of this.

The VPA also quotes Title IX's prohibition on discrimination on the basis of sex. *Id.* But it offers no authority to support the idea that forfeiting a basketball game somehow violates Title IX. And its failure to point to anything in its policies or the law to support its conclusion that Mid Vermont's religious exercise qualifies as impermissible discrimination exposes the VPA's hostility toward Mid Vermont's beliefs.

### 2. The VPA's refusal to consider a compromise

"*Second*, a suspicion of religious animosity is further raised here" by the VPA's refusal to consider that Mid Vermont's decision to forfeit offered a meaningful compromise: Long Trail could continue on in the tournament while Mid Vermont could avoid violating its beliefs. *New Hope*, 966 F.3d at 166. That decision penalized Mid Vermont more than it did Long Trail. And Mid Vermont was willing to accept that self-imposed penalty as the price of exercising its beliefs. JA238.

Rather than accepting that compromise, though, the VPA made an "immediate determination of ineligibility," expelling Mid Vermont from all VPA "activities and tournaments going forward." JA49, 178. The VPA never explains why it rushed to judgment so quickly. And its claim that Mid Vermont's forfeit marginalized students who identify as transgender and placed them "under an unnecessary spotlight of negative attention" falls flat considering the full-blown ban the VPA imposed on Mid Vermont. Nichols' Resp. Br. 20.

14

Indeed, expelling all of Mid Vermont's sports teams across the board had the effect of "marginalizing *them* and placing them under an unnecessary spotlight of negative attention." *Id.* (emphasis added). The VPA did this even though religion is a protected class under its policies. JA142. And its callous refusal to consider any alternative that would have allowed Mid Vermont to continue to participate without violating its religious beliefs further shows the VPA's hostility toward those beliefs. *New Hope*, 966 F.3d at 166–67.

### 3. The VPA's statements showing religious hostility

"*Third*, even before discovery," the record contains statements made by VPA personnel that are similar to statements in *Masterpiece Cakeshop* and, combined with the other factors here, prove the VPA's hostility toward Mid Vermont's beliefs. *New Hope*, 966 F.3d at 167–68.

For example, Nichols disparaged Mid Vermont's religious beliefs as a mere pretext for discrimination, telling the Vermont legislature that Mid Vermont's position on sex-separated sports teams is "blatant discrimination under the guise of religious freedom." JA50, 182. In the district court, the VPA accused Mid Vermont of trying to "enlist the aid of [the] Court in harming other children just because of who they are." JA457. And at a hearing, the VPA's counsel flippantly compared Mid Vermont's beliefs to opposition to allowing women to vote and to allowing "racial minorities … equal access to public facilities." JA820–21.

In a similar vein, the VPA Activity Standards Committee denied Mid Vermont's appeal on the theory that Mid Vermont was "wrong" about what its religious beliefs required. JA248. In the Committee's view, the fact that "Brigham Young University athletes do not compromise their Mormon faith—or endorse Catholicism—when they play Notre Dame" somehow proved that Mid Vermont could play a girls' basketball game against a male athlete without violating its beliefs. *Id.*

The VPA responds to none of this. Instead, it doubles down on minimizing and disparaging Mid Vermont's beliefs. It falsely says that Mid Vermont forfeited the game against Long Trail because it "ideologically disagreed with the identity of a player on the opposing team." Nichols' Resp. Br. 18. And it casually insists that "[p]laying against a different team with different beliefs, with players that the School would not admit on its own teams, does not burden the School's religious beliefs or practices." *Id.* at 21. "Aside from [Mid Vermont's] stated belief that playing against transgender players would be propagating a lie against their religion," the VPA claims "there is no support" for Mid Vermont's position that playing the game would have forced it to violate its beliefs. *Id.* at 22. As if propagating a lie against Mid Vermont's religion isn't enough.

The VPA's treatment of Mid Vermont's religious beliefs throughout this case proves the point "that government has no role in deciding or even suggesting whether the religious ground for [Mid Vermont's]

16

conscience-based objection is legitimate or illegitimate." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 639 (2018). State actors "cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Id.* at 638. The VPA has done nothing but "pass[] judgment upon [and] presuppose[] the illegitimacy" of Mid Vermont's beliefs and practices since this case began. *Id.* And that judgment further confirms the VPA's hostility toward those beliefs.

### 4. The severity of the VPA's imposed penalty

"*Fourth*, another matter bearing on religious hostility" is the "severity" of the VPA's action in permanently and immediately banning Mid Vermont from *all* VPA activities without even initially giving it the due process that the VPA's own policies required. *New Hope*, 966 F.3d at 168. At the urging of the court below, the VPA ultimately relented and allowed Mid Vermont to rejoin the VPA for the limited purpose of co-ed activities. JA965, 982–83. But the VPA did not even offer that more narrowly tailored penalty initially. And "it is not unreasonable to infer" from the VPA's heavy-handed response that it was seeking "not to effectuate [its] stated governmental interests, but to suppress" Mid Vermont's religiously motivated conduct. *New Hope*, 966 F.3d at 167 (quoting *Lukumi*, 508 U.S. at 538) (cleaned up). The VPA does not even mention this argument in its brief—much less offer a response.

17

## 5.   The effect of the VPA's enforcement decisions

5. *Fifth* and finally, the fact that Mid Vermont is apparently the only school that the VPA has ever completely banned further shows that its expulsion decision was not neutral toward Mid Vermont's religion. Peter D'Auria, *Vermont religious school that refused to play team with trans player banned from sporting events*, VTDigger (Mar. 13, 2023), perma.cc/3LU5-2TY4; JA951. That's "because 'the effect of a law in its real operation' can be 'strong evidence of its object.'" *New Hope*, 966 F.3d at 169 (quoting *Lukumi*, 508 U.S. at 535).

The VPA wrongly insists that to prove non-neutrality, Mid Vermont must "establish that the VPA's actions purposely and exclusively applied only to them as *religious actors*." Nichols' Resp. Br. 13 (citing *Cent. Rabbinical Cong. of U.S. & Canada v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 196 (2d Cir. 2014)). But this Court's caselaw does not establish such a high bar for non-neutrality. Such a showing was *sufficient* in *Central Rabbinical*—but that doesn't make it *necessary*. No such showing was required in *New Hope* or the Supreme Court's decision in *Masterpiece Cakeshop*. So the VPA cannot escape strict scrutiny by hiding behind an artificially inflated burden of proof.

The same is true of the VPA's feigned ignorance of Mid Vermont's religious beliefs. Nichols' Resp. Br. 13–14. The VPA notes that Mid Vermont's first letter to the VPA referenced the School's "fairness and safety concerns only," not its religious beliefs. *Id.* But the VPA knew

18

that Mid Vermont *Christian* School was a religious school—especially after 28 years. JA16–17. And the VPA knew about Mid Vermont's religious views about marriage and sexuality *before* it made its initial expulsion decision. A separate letter referencing those views was quoted in the same news article the VPA cited in its press release announcing its expulsion decision. JA179; Benjamin Rosenberg, *MVCS girls basketball forfeits playoff game rather than compete against team with transgender player*, Valley News (Feb. 25, 2023), perma.cc/FFX8-JLE2.

What's more, the VPA was forced to undo its initial expulsion decision because it did not follow its own required procedures in rushing to punish Mid Vermont for its religious exercise. JA484. And Mid Vermont Principal Vicky Fogg explained to the VPA in her appeal of that decision that Mid Vermont's position is "rooted in its religious beliefs," specifically its belief that "sex is God-given and immutable and that God created each of us either male or female." JA238. Fogg also told the VPA that knowingly placing its students "in an unsafe situation" would violate the School's religious beliefs. *Id.* So the VPA was well aware of Mid Vermont's beliefs about what its religion requires when it doubled down on its decision to expel Mid Vermont from its membership. JA248. It simply dismissed those beliefs as "wrong." *Id.* And it likewise dismissed Mid Vermont's concerns about its players' safety as being based on "a myth that transgender students endanger others when they participate in high school sports." JA247.

It's not a myth. As Mid Vermont alleged in its complaint, a "high school girl in North Carolina suffered severe head and neck injuries resulting in long-term concussion symptoms after a biological male on the other team spiked a volleyball in her face." JA47 (citing Alec Schemmel, *Injured volleyball player speaks out after alleged transgender opponent spiked ball at her,* ABC 13 News (Apr. 20, 2023), perma.cc/6QW3-4KLL). As a result, the district canceled games against the school due to safety concerns. Alec Schemmel, *Districts cancels girls volleyball games against school with trans player, cites safety concerns*, The National News Desk (Oct. 18, 2022), perma.cc/FK8F-TURY.

That trend has continued. In recent months, multiple college volleyball teams have forfeited games due to safety concerns about playing against a male player who identifies as female at San Jose State University. Elizabeth Troutman Mitchell, *Christian School Punished for Forfeiting Game With 'Transgender' Player, Though a Dozen Women's Teams Won't Play Biological Males*, The Daily Signal (Nov. 1, 2024), perma.cc/3XG8-2YLT. And at the high-school level, a girls' basketball team in Massachusetts forfeited a game against a team with a male athlete identifying as transgender. *Id.* The athlete severely injured three girls in less than 16 minutes of play. *Id.*

20

To date, it does not appear that any of these schools have been expelled from their athletic associations. Indeed, Mid Vermont is not aware of *any* other school across the country that has been expelled for forfeiting a single game based on concerns about forcing girls to compete against a male student who identifies as female. And back in Vermont, Mid Vermont's concerns about forcing its girls to compete against the male Long Trail athlete proved prescient: that athlete injured at least two female athletes in late 2023 and early 2024—each time delivering an elbow to the girl's head. JA201 n.2 (citing Brandon Canevari, *Long Trail School pulls off comeback*, Bennington Banner (Dec. 15, 2023), perma.cc/DG7X-8PU2), 587 n.3 (citing Suppl. Decl. of Chris Goodwin at JA634 and video at vimeo.com/915286290/f7a845a44e ?share=copy). Yet the VPA has shown no signs of reconsidering Mid Vermont's expulsion.

Taken together, the unprecedented nature of the VPA's expulsion decision and the fact that such a penalty has only been doled out to a single religious school further support the conclusion that the VPA has not afforded Mid Vermont's religious beliefs the neutral treatment the Constitution requires. *New Hope*, 966 F.3d at 168–69. As a result, this Court can, and should, "set aside" the VPA's expulsion decision without requiring further analysis. *Masterpiece Cakeshop*, 584 U.S. at 639; *accord Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 n.1 (2022). At the very least, the Court should apply strict scrutiny and reverse.

II.    **Excluding Mid Vermont from a public benefit also triggers strict scrutiny, and the School Defendants' conclusory claim that VPA membership is not a public benefit fails.**

As Mid Vermont argued in its opening brief, the VPA's decision to expel Mid Vermont independently triggers strict scrutiny because the VPA excluded Mid Vermont from a public benefit "solely because of the School's religious exercise." Opening Br. 50. Under the Supreme Court's decisions in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017), *Espinoza v. Montana Department of Revenue*, 591 U.S. 464 (2020), and *Carson v. Makin*, 596 U.S. 767 (2022), that "exclusion violates the Free Exercise Clause regardless of what this Court decides about the general applicability or neutrality of the VPA's actions." Opening Br. 50.

"Regardless of how the benefit and restriction are described," a program that "operates to identify and exclude otherwise eligible schools on the basis of their religious exercise" violates the Free Exercise Clause of the First Amendment. *Carson*, 596 U.S. at 789. And the VPA's enforcement of its policies operates in exactly that manner and has exactly that effect.

Rather than respond to that argument, the VPA ignores it. The VPA never cites *Trinity Lutheran*, *Espinoza*, or *Carson* in its brief. Nichols' Resp. Br. iii–iv. It also has never denied that it was engaged in state action when it expelled Mid Vermont from its membership. Nor has it denied that VPA membership is a public benefit.

22

Apparently seeking to fill that gap—while conceding they no longer have a direct interest in this case—the State Defendants argue in their brief that VPA membership is *not* a "public benefit which would trigger strict scrutiny review." School Defs.' Resp. Br. 7. In support, they cite Justice Breyer's solo concurring opinion in *Trinity Lutheran* that funding for the playground resurfacing materials at issue there was akin to "general government services" like "ordinary police and fire protection." *Id.* (quoting *Trinity Lutheran*, 582 U.S. at 471 (Breyer, J., concurring) (quoting *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 17–18 (1947))). As Justice Breyer acknowledged, "[p]ublic benefits come in many shapes and sizes." *Trinity Lutheran*, 582 U.S. at 471 (Breyer, J., concurring). And he would have left "the application of the Free Exercise Clause to other kinds of public benefits for another day." *Id.*

But Justice Breyer's solo concurring opinion is not controlling. And Justices Gorsuch and Thomas wrote separately to make clear that the footnoted reference to "playground resurfacing" that they refused to join in the main opinion should not be read to limit the opinion's scope to "only those [cases] with some association with children's safety or health." *Id.* at 470 (Gorsuch, J., concurring in part). And because the programs in *Espinoza* and *Carson* did not involve safety, health, or general protection, those cases prove that the broader view of public benefit ultimately carried the day.

Beyond Justice Breyer's *Trinity Lutheran* concurrence, the State Defendants cite no authority for their claim that "VPA membership is at best a quasi-public opportunity available to schools which commit to the VPA's rules" and "adherence to the VPA's policies." School Defs.' Resp. Br. 7. And the fact that a state actor conditions access to a benefit on "adherence to [its] policies" does not transform the benefit into something less than a public benefit. Otherwise, the funds in *Trinity Lutheran*, *Espinoza*, and *Carson* all would have been deemed "quasi-public opportunit[ies] available to schools which commit to" the government's rules. *Id.* They were not. So that argument fails.

As Mid Vermont explained in its complaint, the VPA engages in state action because it "'includes most public schools located within the State [of Vermont], acts through their representatives, draws its officers from them, is largely funded by their dues and income received in their stead, and has historically been seen to regulate in lieu of the [Agency] of Education's exercise of its own authority.'" JA28 (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 290–91 (2001)). The VPA "works hand-in-hand with the Agency in various ways," including in its implementation of the policies it enforced against Mid Vermont. JA31. And the state legislature "has delegated important public functions and duties to the VPA." JA32 (collecting examples). That explains why the VPA has repeatedly conceded that it is a state actor "for the purposes of this dispute." JA455, 461, 558, 562, 710.

24

The VPA itself also has not denied that it offers schools a public benefit, and for good reason. "The VPA oversees sports and activities for its 270 member schools in Vermont." JA29. It "currently oversees 28 sports and activities in Vermont." *Id.* It "is the only sports association that includes both public and private middle and high schools in Vermont." *Id.* Under its bylaws, "[a]ny school in Vermont approved by the State Board of Education is eligible to become a school member of the corporation." JA110. And "[a] majority of middle schools in Vermont and all high schools, including all public high schools, in Vermont are members of the VPA." JA29; *accord* Opening Br. 52.

On these facts, excluding Mid Vermont from participating in VPA athletic activities based on its religious exercise is not meaningfully different from Missouri's attempt to exclude religious preschools and daycares from funds for playground-resurfacing materials in *Trinity Lutheran*, 582 U.S. at 453–54, or from Montana's attempt to exclude religious families from using otherwise available scholarship funds at religious schools in *Espinoza*, 591 U.S. at 467–68, or from Maine's attempt to exclude religious families from using tuition funds at the religious schools of their choosing in *Carson*, 596 U.S. at 771–73.

Nor has the Supreme Court ever suggested that its holdings in those cases are limited to the denial of cash payouts from the government. On the contrary, they are premised on the Supreme Court's statement "more than 50 years ago [that] '[i]t is too late in the day to

25

doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a *benefit or privilege*."' *Trinity Lutheran*, 582 U.S. at 463 (emphasis added) (quoting *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)).

Those cases also build upon cases in which the Supreme Court has made clear that the government cannot penalize religious activity by denying anyone equal access to even *non*-monetary "rights, benefits, and privileges enjoyed by other citizens." *Id.* at 460 (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n,* 485 U.S. 439, 449 (1988)); *accord id.* at 459 (discussing *McDaniel v. Paty*, 435 U.S. 618 (1978), a case involving a statute that denied ministers the "benefit" of serving as a delegate to the state constitutional convention). Accordingly, the VPA is right not to deny that it is engaged in state action and offering a public benefit, and the School Defendants' contrary argument fails.

## III. Mid Vermont is likely to succeed because the VPA cannot satisfy strict scrutiny—which the VPA does not deny—and the other factors thus favor an injunction.

Finally, given that Mid Vermont is likely to succeed on the merits of its argument that strict scrutiny applies, it is also likely to succeed on the merits of its free-exercise claim because the VPA cannot satisfy strict scrutiny. As a result, the rest of the preliminary-injunction factors fall into place.

As a threshold issue, an injunction allowing Mid Vermont to rejoin the VPA would return the parties to the status quo ante, meaning "the last peaceable uncontested status preceding the present controversy." *Mastrio v. Sebelius*, 768 F.3d 116, 121 (2d Cir. 2014) (per curiam). Because restoring Mid Vermont's VPA membership would merely "maintain the status quo pending resolution of the case," the injunction Mid Vermont is seeking is a prohibitory injunction, not a mandatory injunction. *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018). "Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it." *Id.*

The VPA argues Mid Vermont is seeking a mandatory injunction because "the uncontested status that preceded the pending controversy" was one in which—according to the VPA—Mid Vermont "would participate fully in all VPA activities, regardless of the opposing teams' players' gender identities." Nichols' Resp. Br. 10. But that was not the pre-suit status quo. Whether Mid Vermont is required to violate its beliefs by competing against male athletes in girls' sporting events *is* the pending controversy. And "[p]reserving the status quo is not confined to ordering the parties to do nothing: it may require parties to take action." *Mastrio*, 768 F.3d at 120–21. That includes the reinstatement of "previously granted benefits." *N. Am. Soccer League*, 883 F.3d at 37. Accordingly, while Mid Vermont could meet the mandatory-injunction standard if it had to, that standard does not apply.

27

On the merits, state action "that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." Opening Br. 54 (quoting *Lukumi*, 508 U.S. at 546). Given "the availability of individualized exceptions," the VPA's "willingness to overlook comparable forfeits," and the existence of more narrowly tailored alternatives, this is not such a case. *Id.* at 54–55.

The VPA does not argue that its expulsion decision satisfies strict scrutiny. Nor does it challenge Mid Vermont's claim that, once it shows it is likely to succeed, the rest of the preliminary-injunction factors fall into place. *Id.* at 56–57. Instead, the VPA says only that it is "disputed" that Mid Vermont is engaged in "a constitutionally protected religious practice that is being unduly restricted by the VPA." Nichols' Resp. Br. 21. But simply rehashing the merits adds nothing to the analysis.

Even so, the VPA works in a few parting shots that mischaracterize Mid Vermont's religious beliefs and criticize its understanding of what its beliefs require. A prime example is the VPA's argument that "[p]laying against a different team with different beliefs, with players that the School would not admit on its own teams, does not burden the School's religious beliefs or practices." *Id.* Mid Vermont does not object to playing teams with "different beliefs." And it *does* "burden [Mid Vermont's] religious beliefs" to force it to, in the VPA's own words, "propagat[e] a lie against their religion." *Id.* at 21–22.

28

The VPA may not understand—and it may prefer to distort and criticize—Mid Vermont's religious beliefs. But the "Free Exercise Clause bars even subtle departures from neutrality on matters of religion." *Masterpiece Cakeshop*, 584 U.S. at 638. And the VPA's departures have been far from subtle. This Court should reverse.

## CONCLUSION

"The Constitution commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures." *Masterpiece Cakeshop*, 584 U.S. at 638–39. For all the reasons stated, the VPA has violated that duty here. And Mid Vermont is entitled to preliminary relief now.

This Court should reverse the district court's order denying Mid Vermont's motion for a preliminary injunction, and it should direct the court to enter a preliminary injunction reinstating Mid Vermont's full membership in the VPA and prohibiting the VPA from enforcing its policies against Mid Vermont in the ways described in Mid Vermont's motion for a preliminary injunction, JA187, until the court enters a final ruling on the merits.

29

Dated: November 5, 2024          Respectfully submitted,

                                 *s/Christopher P. Schandevel*

John J. Bursch                   James A. Campbell
ALLIANCE DEFENDING FREEDOM       Christopher P. Schandevel
440 First Street NW, Suite 600   Jacob E. Reed
Washington, DC 20001             ALLIANCE DEFENDING FREEDOM
(616) 450-4235                   44180 Riverside Pkwy
jbursch@ADFlegal.org             Lansdowne, VA 20176
                                 (571) 707-4655
David A. Cortman                 jcampbell@ADFlegal.org
ALLIANCE DEFENDING FREEDOM       cschandevel@ADFlegal.org
1000 Hurricane Shoals Rd. NE     jreed@ADFlegal.org
Suite D-1100
Lawrenceville, GA 30043          Ryan J. Tucker
(770) 339-0774                   ALLIANCE DEFENDING FREEDOM
dcortman@ADFlegal.org            15100 N. 90th Street
                                 Scottsdale, AZ 85260
                                 (480) 444-0020
                                 rtucker@ADFlegal.org

        *Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because it contains 6,922 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

November 5, 2024

*/s/ Christopher P. Schandevel*
Christopher P. Schandevel
*Counsel for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

/s/ Christopher P. Schandevel
Christopher P. Schandevel
*Counsel for Appellants*

November 5, 2024