24-1704
*Mid Vermont Christian School v. Saunders*

# United States Court of Appeals
# For the Second Circuit

August Term 2024
Argued: April 9, 2025
Decided: September 9, 2025

No. 24-1704

MID VERMONT CHRISTIAN SCHOOL, A.G., M.G.,
CHRISTOPHER GOODWIN, BETHANY GOODWIN,

*Plaintiffs-Appellants*,

*v.*

ZOIE SAUNDERS, JENNIFER DECK SAMUELSON,
CHRISTINE BOURNE, HARTLAND SCHOOL BOARD,
RANDALL GAWEL, WAITS RIVER VALLEY (UNIFIED
#36 ELEMENTARY) SCHOOL BOARD, JAY NICHOLS,

*Defendants-Appellees.*[*]

Appeal from the United States District Court
for the District of Vermont
No. 2:23-cv-652
Geoffrey W. Crawford, *Judge*.

---

[*] The Clerk of Court is respectfully directed to amend the caption as set forth above.

24-1704
*Mid Vermont Christian School v. Saunders*

Before:    WESLEY, SULLIVAN, and PARK, *Circuit Judge*s.

Mid Vermont Christian School forfeited a girls' playoff basketball game to avoid playing a team with a transgender athlete. The school believes that forcing girls to compete against biological males would affirm that those males are females, in violation of its religious beliefs. In response to the forfeit, the Vermont Principals' Association ("VPA") expelled the school from all state-sponsored extracurricular activities. Plaintiffs Mid Vermont and several students and parents sued, bringing a Free Exercise claim and seeking a preliminary injunction to reinstate the school's VPA membership and for other relief. The district court (Crawford, *J.*) denied the motion. We conclude that Plaintiffs are likely to succeed in showing that the VPA's expulsion of Mid Vermont was not neutral because it displayed hostility toward the school's religious beliefs; Plaintiffs are therefore likely to prevail on their Free Exercise claim. Because Plaintiffs also satisfy the remaining requirements for injunctive relief, the order of the district court is **REVERSED**, and the case is **REMANDED** for further proceedings and with instructions to grant Plaintiffs' motion for a preliminary injunction insofar as it seeks Mid Vermont's reinstatement in the VPA.

———

> DAVID A. CORTMAN, John J. Bursch, James A. Campbell, Christopher P. Schandevel, Jacob Reed, Ryan J. Tucker, Alliance Defending Freedom, Lawrenceville, GA, Washington, DC, Lansdowne, VA, and Scottsdale, AZ, *for Plaintiffs-Appellants*.

2

24-1704
*Mid Vermont Christian School v. Saunders*

>STEVEN J. ZAKRZEWSKI, Gordon Rees Scully Mansukhani, Hartford, CT, Pietro J. Lynn, Lynn, Lynn, Blackman & Toohey, P.C., Burlington, VT, *for Defendants-Appellees*.
>
>Duncan F. Kilmartin, Newport, VT, *for Amicus Curiae Citizens for Self-Governance.*
>
>Adam J. Hunt, Morrison & Foerster LLP, New York, NY, *for Amici Curiae National Education Association, Public Funds Public Schools, National School Boards Association, American Federation of Teachers.*
>
>Alexandra Zaretsky, Americans United for Separation of Church and State, Washington, DC, *for Amicus Curiae Americans United for Separation of Church and State.*

————

PARK, *Circuit Judge*:

Mid Vermont Christian School forfeited a girls' playoff basketball game to avoid playing a team with a transgender athlete. The school believes that forcing girls to compete against biological males would affirm that those males are females, in violation of its religious beliefs. In response to the forfeit, the Vermont Principals' Association ("VPA") expelled the school from all state-sponsored extracurricular activities. Plaintiffs Mid Vermont and several students and parents sued, bringing a Free Exercise claim and seeking a preliminary injunction to reinstate the school's VPA membership and for other relief. The district court (Crawford, *J.*) denied the motion. We conclude that Plaintiffs are likely to succeed in showing that the VPA's expulsion of Mid Vermont was not neutral because it

3

24-1704
*Mid Vermont Christian School v. Saunders*

displayed hostility toward the school's religious beliefs; Plaintiffs are therefore likely to prevail on their Free Exercise claim. Because Plaintiffs also satisfy the remaining requirements for injunctive relief, the order of the district court is reversed, and the case is remanded for further proceedings and with instructions to grant Plaintiffs' motion for a preliminary injunction insofar as it seeks Mid Vermont's reinstatement in the VPA.

## I. BACKGROUND

A.  Factual Background

   1.  *Mid Vermont's Expulsion*

The Vermont Principals' Association ("VPA") regulates middle- and high-school extracurriculars in Vermont. It counts among its members every public and private high school in the state, describes itself as "an administrative arm of the State," App'x at 563, and performs public functions on behalf of the Agency of Education, *see* 16 V.S.A. §§ 245(a), 1693(b). The parties agree that the VPA is a state actor.

Mid Vermont Christian School ("Mid Vermont") is a private, Christian pre-K through 12th-grade school in Quechee, Vermont. Founded in 1987, it seeks to "glorify God by preparing each student for college, career, and Christian ministry through a program of academic excellence established in Biblical truth." App'x at 86. As part of its religious practice, it believes that "sex is God-given and immutable and that God created each of us either male or female." *Id.* at 238. Mid Vermont joined the VPA around the same time it fielded

4

24-1704
*Mid Vermont Christian School v. Saunders*

its first basketball team during the 1993–94 school year and has been a member ever since.

In 2023, Mid Vermont's girls' varsity basketball team made the state playoffs. And in the first round of the tournament, they were scheduled to face off against the Long Trail School ("Long Trail"), whose team featured a biological male. Concerned about "[f]airness and the safety of the girls," Mid Vermont asked the VPA to stop the transgender athlete from playing. App'x at 233. The VPA denied the request, claiming that such an accommodation would violate its policies concerning "gender identity and participation," the Vermont Public Accommodations Act, and the Agency of Education's "Best Practices For Schools For Transgender And Gender Nonconforming Students." *Id.* at 235. The VPA Policy on Gender Identity provides students "the opportunity to participate in VPA activities in a manner consistent with their gender identity." *Id.* at 142.

On February 20, 2023, Mid Vermont forfeited its game against Long Trail. The school explained its decision in a press release:

> We withdrew from the tournament because we believe playing against an opponent with a biological male jeopardizes the fairness of the game and the safety of our players. Allowing biological males to participate in women's sports sets a bad precedent for the future of women's sports in general.

App'x at 237.

Two days later, the VPA's Executive Director—Jay Nichols—testified before Vermont's House Education Committee in support of H.258, a bill that would prevent private, religious schools from

5

24-1704
*Mid Vermont Christian School v. Saunders*

receiving public funding. Nichols opened his remarks by explaining that "we should never provide any tax dollars to schools that . . . look away from the common decency of all students being welcomed." App'x at 181. And while complaining about schools whose curricula feature "Christian values," Nichols discussed Mid Vermont's forfeit against Long Trail:

> A state approved Christian private school sends a letter to the VPA asking that another school no longer be allowed to play a transgender identifying youth . . . . [T]his Christian school forfeits so they won't have to play against this team that has a transgender student . . . . The VPA followed the law, of course, and our policies, and will continue to ensure this child and all transgender student athletes have equal access to educational opportunities the same as all Vermont children should have. Thank goodness the student in question didn't attend that religious school . . . but what if they did? Would we be okay with that blatant discrimination under the guise of religious freedom?

*Id.* at 182.

Three weeks after the forfeit, the VPA announced the "immediate determination of ineligibility for Mid-Vermont Christian in VPA sanctioned activities and tournaments going forward." App'x at 178. That expulsion barred Mid Vermont from participating in *any* VPA extracurricular activity, from girls' and boys' sports to co-educational, non-athletic events like spelling bees, science fairs, drama festivals, and debate competitions.

6

24-1704
*Mid Vermont Christian School v. Saunders*

### 2.　*Administrative Appeal*

Mid Vermont responded to the expulsion by writing to the VPA and the VPA's Activities Standards Committee ("Committee"). It pointed out that the VPA violated its own policies by failing to provide Mid Vermont with written notice of its alleged violation, a recommended penalty, and the option to file an appeal. The letter also explained that Mid Vermont forfeited because it had "serious concerns over the safety of its female athletes" and because it believed that "forcing our young ladies to compete against biological males" would make the school "affirm something that violates our religious beliefs—i.e., that the males who play in the girls' league are females." App'x at 238.

On April 3, 2023, the Committee notified Nichols and Mid Vermont that it "cannot address the substantive arguments in the Appeal until and unless the proper procedures are followed under VPA Policies." App'x at 484. These included the requirement that Nichols or a designee "issue a notice of probable violation describing the charges, the recommended penalty, and advise the alleged violator of the right to be heard" by the Committee. *Id.* Indeed, the Committee warned that "[i]f the VPA wishes to proceed with discipline in this case, [its] Executive Director or designee must first issue [such] notice." *Id.*

The next day, Nichols provided Mid Vermont with an after-the-fact Notice of Violation. Mid Vermont in turn submitted a second written notice of appeal, repeating the points made in its previous challenge.

7

24-1704
*Mid Vermont Christian School v. Saunders*

On May 8, the Committee upheld the expulsion. Its ruling stated that "[i]t is a myth that transgender students endanger others when they participate in high school sports or create unfair competition." App'x at 247. It further explained that "[h]ad the School made a sincere commitment to abide by VPA Policies and Vermont law, and that its teams would compete with other schools who include transgender athletes, we would be open to penalties short of expulsion." *Id.* at 248. It then rejected Mid Vermont's religious objection to playing Long Trail:

> The School's claim is wrong. Participating in an athletic contest does not signify a common belief with the opponent. Brigham Young University athletes do not compromise their Mormon faith—or endorse Catholicism—when they play Notre Dame. The act of playing together on a basketball court does not imply any approval of the values or beliefs of the opponent.
>
> This case has nothing to do with beliefs. It has everything to do with actions and their impact on transgender students.

*Id.*

That fall, Mid Vermont contacted the VPA about reapplying for membership. Nichols responded that the Committee's decision is "binding" and "cannot now be challenged." App'x at 253. Still, he asked Mid Vermont to "address in writing how the School intends to assure that it will meet [its] obligations if the School again becomes a member of the VPA." *Id.* Quoting the Committee's decision on appeal, Nichols further specified that Mid Vermont would be required to make "a sincere commitment to abide by VPA Policies

8

24-1704
*Mid Vermont Christian School v. Saunders*

and Vermont law" and to "compete with other schools who include transgender athletes." *Id.*

It is undisputed that due to its religious beliefs, Mid Vermont could not make that commitment. It instead joined the New England Association of Christian Schools ("NEACS"). But the closest NEACS school is in Concord, New Hampshire, so Mid Vermont has incurred "significant time and expense in traveling f[a]rther away to play schools." App'x at 343.

B.   Procedural History

In November 2023, Mid Vermont, along with four students and their parents (collectively, "Plaintiffs"), sued for declaratory and injunctive relief and compensatory damages. Plaintiffs brought claims against Nichols (as the VPA executive director), two school boards, and various state education officials, including the interim Secretary of the Vermont Agency of Education, the Chair of the Vermont State Board of Education, and the superintendents of two unions (collectively, "Defendants"). Mid Vermont also moved for a preliminary injunction, seeking readmission to the VPA "as a full-status member eligible to participate in all VPA events and activities" and several assurances, including that the VPA would not "force the School to . . . rewrite its own policies to conform with the VPA's gender identity policy." App'x at 187. Defendants opposed that motion and moved to dismiss the complaint.[1]

---

[1] Plaintiffs also requested relief in connection with their claims for tuition payments under the "Town Tuitioning Program." Those claims—and all aspects of the motion related to those claims—are not before us on appeal.

9

24-1704
*Mid Vermont Christian School v. Saunders*

In June 2024, the district court denied the request for a preliminary injunction. The district court found that the VPA's "directives concerning transgender athletes are rules of general application and neutral as to religion." App'x at 874. It noted that "this case is one of neutral application of educational policies that apply to all Vermont schools." *Id.* at 876. Therefore, applying rational-basis review, the court concluded that "Vermont's policy of recognizing the gender choice of high school athletes is not likely to result in a ruling favorable to Mid Vermont." *Id.*

Plaintiffs timely filed a notice of appeal and moved for an injunction pending appeal. The district court denied that motion, reaffirming that it found Mid Vermont unlikely to prevail on its claim. But it noted that "[i]t seems likely . . . that the exclusion of Mid Vermont from activities such as debate tournaments and science fairs in which boys and girls compete on the same team is unnecessary and excessive." App'x at 958. In July 2024, Defendants agreed to allow Mid Vermont to participate in co-educational, non-athletic activities. And that same month, the district court stated that "[s]ince the issue of injunctive relief is going up on appeal, the court will defer any ruling on [the motions to dismiss] until the appeal is resolved and the case is returned to this court." *Id.* at 959.

## II. DISCUSSION

Plaintiffs seek to enjoin the enforcement of their expulsion from the VPA. The district court denied a preliminary injunction. It found that the VPA's policies are generally applicable and neutral, and thus subject only to rational-basis review. We do not reach that question here. Instead, we conclude that Plaintiffs are likely to succeed in showing that the VPA did not consider Mid Vermont's case with the

10

24-1704
*Mid Vermont Christian School v. Saunders*

neutrality that the Free Exercise Clause requires because it was hostile to Mid Vermont's religious views. We also conclude that Plaintiffs have demonstrated that they will suffer irreparable harm absent an injunction, and that the public interest favors injunctive relief. Accordingly, we reverse the district court's order and grant Plaintiffs' motion for a preliminary injunction insofar as it seeks Mid Vermont's reinstatement to full membership in the VPA pending the resolution of this case.

A.    Legal Standard

When "a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020) (quotation marks omitted). "We review a district court's denial of a preliminary injunction for abuse of discretion, but must assess *de novo* whether the court proceeded on the basis of an erroneous view of the applicable law." *Id.* (quotation marks omitted).

B.    Likelihood of Success on the Merits

The VPA likely violated Mid Vermont's First Amendment right to free exercise of religion because its consideration of Mid Vermont's case was not neutral.

1.    *Legal Framework*

The First Amendment provides that the government "shall make no law respecting an establishment of religion, or prohibiting

11

24-1704
*Mid Vermont Christian School v. Saunders*

the free exercise thereof." U.S. Const. amend. I; *see Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (incorporating the Free Exercise Clause against the states). "At its heart, the Free Exercise Clause of the First Amendment protects the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of religious acts." *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2351 (2025) (quotation marks omitted). It "guarantees to all Americans the right to believe and profess whatever religious doctrine they desire, even doctrines out of favor with a majority of fellow citizens." *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 161 (2d Cir. 2020) (cleaned up).

Of course, the protections afforded under the First Amendment are not limitless. The Supreme Court has recognized that the Free Exercise Clause "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability." *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 630-31 (2018) (quotation marks omitted). Nonetheless, even under a neutral law of general applicability, the government still "fails to act neutrally when it proceeds in a manner intolerant of religious beliefs." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021). The First Amendment, in other words, guarantees not only that our laws be neutrally drafted, but that they subsequently "be *applied* in a manner that is neutral toward religion." *Masterpiece Cakeshop*, 584 U.S. at 640 (emphasis added). The government is thus "obliged under the Free Exercise Clause to proceed in a manner neutral toward and tolerant of . . . religious beliefs" when taking action to enforce its laws—even laws that may be neutral and generally applicable on their face. *Id.* at 638. A plaintiff may therefore "prove a free exercise violation by showing that

12

24-1704
*Mid Vermont Christian School v. Saunders*

'official expressions of hostility' to religion accompany" actions taken by the government to enforce its laws, and in such cases courts may set aside the adverse results of tainted enforcement proceedings "without further inquiry." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 n.1 (2022) (quoting *Masterpiece Cakeshop*, 584 U.S. at 639).

    2.    *Application*

Plaintiffs argue that the VPA's expulsion decision was non-neutral and hostile toward Mid Vermont's religious beliefs. Based on the undisputed record, we conclude that Plaintiffs are likely to succeed in establishing that the VPA's decision was indeed accompanied by official expressions of hostility to religion.

"The Free Exercise Clause commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993). "Factors relevant to the assessment of governmental neutrality include the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Masterpiece Cakeshop*, 584 U.S. at 639 (quotation marks omitted). From the record developed below, we conclude that Plaintiffs are likely to show that the VPA did not act neutrally toward Mid Vermont's religious beliefs when it rendered its disciplinary decision.

13

24-1704
*Mid Vermont Christian School v. Saunders*

First, Nichols's public statements evinced hostility toward Mid Vermont's religious beliefs. As described above, Nichols testified before Vermont's House Education Committee just two days after Mid Vermont's forfeit—but three weeks *before* the VPA announced the expulsion. Advocating for a bill that would block private, religious schools from receiving public funding, Nichols urged the House Education Committee to "do the right thing" and pass "legislation that doesn't continue to allow misuses of taxpayer dollars to effectively discriminate against many of our children." App'x at 183. In so doing, Nichols offered "official expressions of hostility to religion" that were "inconsistent with what the Free Exercise Clause requires." *Masterpiece Cakeshop*, 584 U.S. at 639.

In his testimony, Nichols listed examples of how religious schools "don't follow the same rules as public schools, at least on the most important issues." App'x at 181. He mentioned that "[t]wo religious schools have refused . . . to sign an assurance that they would follow State Board rules regarding non-discrimination," noting that "[i]t doesn't take a rocket scientist to see that these schools and their far right supporters are gearing up for another lawsuit." *Id.* at 182. He highlighted that "one religious high school that we are now sending public tax dollars to[]" requires "four credits of religion and theology" and "witness[ing] Christian values." *Id.* And he criticized Mid Vermont's forfeit against Long Trail:

> [A] Christian school forfeits so they won't have to play against this team that has a transgender student . . . . Thank goodness the student in question didn't attend that religious school . . . but what if they

14

24-1704
*Mid Vermont Christian School v. Saunders*

> did? Would we be okay with that blatant discrimination under the guise of religious freedom?

*Id.*

Such testimony supports the inference that the VPA's punishment was "informed by hostility toward certain religious beliefs." *New Hope*, 966 F.3d at 160. As Executive Director, Nichols wielded the power to "enforc[e] VPA policies." App'x at 28. On this record, Plaintiffs are likely to succeed in showing that he failed to serve as a "neutral decisionmaker who [gave] full and fair consideration to [Mid Vermont's] religious objection." *Masterpiece Cakeshop*, 584 U.S. at 640.

Second, the record reflects that the VPA itself challenged the school's religious beliefs. Rejecting Mid Vermont's appeal, the Committee explained that the substance of the religious claim was "wrong":

> Participating in an athletic contest does not signify a common belief with the opponent. Brigham Young University athletes do not compromise their Mormon faith—or endorse Catholicism—when they play Notre Dame. The act of playing together on a basketball court does not imply any approval of the values or beliefs of the opponent.
>
> This case has nothing to do with beliefs. It has everything to do with actions and their impact on transgender students.

App'x at 248.

15

24-1704
*Mid Vermont Christian School v. Saunders*

That statement did not just question Mid Vermont's religious *sincerity*. It also attacked the *validity* of Mid Vermont's objection. *See Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989). But "[a]n individual claiming violation of free exercise rights need only demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002) (quotation marks omitted). That is because "courts should not inquire into the centrality of a litigant's religious beliefs." *Kravitz v. Purcell*, 87 F.4th 111, 123 (2d Cir. 2023).

What is binding on courts is equally binding on the VPA. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in . . . religion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943); *see also Yeshiva Univ. v. Yu Pride All.*, 143 S. Ct. 1, 1 (2022) (Alito, *J.*, dissenting) ("The First Amendment guarantees the right to the free exercise of religion, and if that provision means anything, it prohibits a State from enforcing its own preferred interpretation of Holy Scripture."). Put simply, the VPA may not impose discipline based on its view that Mid Vermont's religious objection was "wrong." On this record, Plaintiffs are likely to succeed in establishing that the VPA did exactly that.

Third, the expulsion violated the VPA's own norms. Nichols conceded that, to his recollection, the VPA had never before banned a school from all sporting events. Appellants' Br. at 16. That concession actually understated the severity of the decision, which extended to *any* interschool activity, from spelling bees to math

16

24-1704
*Mid Vermont Christian School v. Saunders*

competitions. *See New Hope*, 966 F.3d at 168 ("[A]nother matter bearing on religious hostility . . . is the severity of [disciplinary] actions."). To be sure, the VPA has since allowed Mid Vermont to participate in co-educational, non-athletic competitions. But that is only because the district court explained that the VPA's expulsion was overbroad. *See* App'x at 958 ("It seems likely to the court that the exclusion of Mid Vermont from activities such as debate tournaments and science fairs in which boys and girls compete on the same team is unnecessary and excessive.").

Making matters worse, the VPA ignored the detailed procedural requirements governing its disciplinary process. Those procedures called for a formal investigation, a preliminary report, written notice of a probable violation, a recommended penalty, and an opportunity to be heard at a hearing involving counsel and evidence. But in its rush to impose an "immediate" expulsion, the VPA flouted its own rules.

In sum, Plaintiffs are likely to succeed in establishing that Defendants acted with hostility toward Mid Vermont's religious beliefs. The VPA's Executive Director publicly castigated Mid Vermont—and religious schools generally—while the VPA rushed to judgment on whether and how to discipline the school. In upholding the expulsion, the VPA doubled down on that hostility by challenging the legitimacy of the school's religious beliefs. And as noted above, the punishment imposed was unprecedented, overbroad, and procedurally irregular. Those facts strongly support the inference that Mid Vermont's religious objection "was not considered with the

17

24-1704
*Mid Vermont Christian School v. Saunders*

neutrality that the Free Exercise Clause requires." *Masterpiece Cakeshop*, 584 U.S. at 639.

Where a state actor's "hostility was inconsistent with the First Amendment's guarantee that our laws be applied in a manner that is neutral toward religion," *id.* at 640, our job is clear. We thus conclude, without engaging in strict scrutiny, that Plaintiffs have made a strong showing that the VPA violated "the minimum requirement of neutrality" to religion. *Lukumi*, 508 U.S. at 533; *see* Stephanie H. Barclay, *Replacing Smith*, 133 YALE L.J. F. 436, 442 (2023) ("When the government is hostile, it does not get an opportunity to present a justification for its exercise-burdening action. Instead, the action is per se invalid.").[2]

C.  Irreparable Harm and Public Interest

We next consider whether Plaintiffs are likely to suffer irreparable harm and whether the public interest favors granting the preliminary injunction. We conclude that Plaintiffs satisfy both inquiries.

First, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (quotation marks omitted); *see Agudath Israel*, 983 F.3d at 636 ("Religious adherents are not required to establish irreparable harm

---

[2] Because the hostility toward Mid Vermont's religious beliefs suffices to show a likely constitutional violation, we do not reach Plaintiffs' arguments concerning general applicability, individualized exemptions, and public benefits.

18

24-1704
*Mid Vermont Christian School v. Saunders*

independent of showing a Free Exercise Clause violation."). In any event, the expulsion subjects Mid Vermont to irreparable practical harm, preventing the school from using VPA competition as a recruiting tool and causing dozens of students to lose opportunities to participate in VPA sports and to pursue athletic scholarships. *See McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 302 n.25 (2d Cir. 2004) (finding that "the inability to play in the fall season, which deprives [plaintiffs] the chance for Regional and State Championship competition, constitutes irreparable harm"). Those lost opportunities constitute irreparable harm.

Second, "the public interest is well served by the correction of this constitutional harm." *A.H. ex rel. Hester v. French*, 985 F.3d 165, 184 (2d Cir. 2021). As noted, enjoining the VPA's expulsion of Mid Vermont will allow the school's students to compete in VPA sports and pursue athletic scholarships. There is a strong public interest in ensuring that students and schools do not lose out on valuable athletic opportunities by virtue of the government's hostility to religion. The public interest thus favors reinstating Mid Vermont's VPA membership.

### III. CONCLUSION

The order of the district court is reversed and the case is remanded for further proceedings and with instructions to grant Plaintiffs' motion for a preliminary injunction insofar as it seeks Mid Vermont's reinstatement to full membership in the VPA pending the resolution of this case.